**Application of Jay R. BRAND-STADTER et al.**

**Patent Appeal No. 8892.**

United States Court of Customs and Patent Appeals.

Sept. 20, 1973.

---

Roy C. Lipton, Kenneth B. Hamlin, Bell Telephone Labs. Inc., Murray Hill, N. J., for appellants.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Jere W. Sears, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1, 3–9, and 11 of appellants' application serial No. 528,852, filed February 21, 1966, for a "Message Retrieving Organization." We affirm.

### The Invention

The invention of the appealed claims is apparatus for allowing subscribers of a store and forward communications system to retrieve previously originated data messages. Each message is stored in a permanent file memory and coincidentally therewith the permanent file memory location of the message is stored in a cross-reference file memory in a portion dedicated to the station originating the message. Message retrieval requests by the subscribers are queued into linked lists by permanent file location numbers. The stored messages are then transmitted to the appropriate requesting subscriber in accordance with the queued requests.

A rather lengthy explanation of the invention is given in the following de-

scription from appellants' brief (record references omitted). Reference is to Figs. 1A, 1B, 1C, and 5 of the application reproduced below:

[A9273]

For a general understanding of store and forward communication systems and the prior methods of retrieving messages, recourse may be had to FIG. 1A of the application. As seen in the Figure, subscriber stations 10 are connected by way of translation network 20 to common control unit 30 of a message center. Messages originated from the various subscriber stations and received by common control unit 30 are temporarily stored in memory 25. Thereafter, control unit 30 forwards the temporarily stored message to selected ones of the stations 10 which are identified in the message heading.

The messages processed through common control unit 30 may also be stored on tape reels. Control unit 30 selects one of tape units $40_1$ through $40_3$ and stores the received data messages on the tape reel therein. As messages are received from the various subscriber stations, it is conventional to store them on successive records of a tape reel, independent of the message source or destination. The tape unit provides the tape reel and record identity information to common control unit 30. Common control unit 30 is therefore advised when the reel becomes full and thereupon selects another unit to store the subsequent data messages.

It is advantageous in systems of this type to identify each message with a message number. This may be provided by a station message counter, such as counters 58 in FIG. 1B. When a message is originated by any subscriber the indication is sent to counters 58 by common control unit 30. Counters 58 select a message number for the message and this number is returned to the subscriber for subsequent identification of the message.

*       *       *       *       *       *

The present arrangement is directed to a cross-reference file memory which includes block portions or storage areas dedicated to each subscriber. As each message is received from a subscriber and stored in a record of a tape reel, the permanent file storage location (identity of the tape reel and the particular record of the reel) of the message, together with the message number and a current time and date, is entered into the subscriber's portion of the cross-reference file memory. The file merory further includes common storage areas allocated to the subscriber when the number of messages is such that his storage area is filled.

In order to retrieve a message, the subscriber sends the approximate time and date that the message was processed and the message number. The subscriber's identity and the time and date and message number information is utilized to locate the address of the cross-reference storage area containing the entry identifying the permanent file storage location of the message.

* * * the permanent file location information obtained from the cross-reference storage area might be directly employed by control unit 30 to interrogate the corresponding permanent file tape reel and record and thereby retrieve the message. This arrangement for retrieving messages comprises the broad concept of this invention and provides the basis for the subject matter of apparatus claims 1 and 9 * * *.

Consecutively requested messages would in general be found on different tape reels or on widely separated records of a single reel. Therefore, when a large number of retrieval requests are anticipated, the above-described mode of operation may be time consuming. A specific feature of this invention is directed to a queueing memory which overcomes these difficulties.

Each specific permanent file location entry read out of the cross-reference file is stored in the queueing memory. At the same time, instructions defining a sequential order for the entries, grouping together entries located on the same tape reel and assembling the order or sequence of each group to correspond to the order of their respective record locations in the reel, are stored in the queueing memory. The permanent file loca-

tions are thereafter obtained from the queueing memory in the linked order defined by the instructions.

An illustrative embodiment of the invention, comprising a plurality of apparatus units, is described in the specification and is shown in FIGS. 1A, 1B and 1C. An alternative arrangement is also suggested wherein selected ones of the units "may be replaced by stored program routines employed in conjunction with . . . common control unit 30". The appartus units which are involved in message retrieval will now be described.

The cross-reference file memory is identified as memory 50 and is shown in FIG. 1B of the application. * * *

Upon receipt of the data message, common control unit 30 sends the identity of the originating subscriber to translator 55, FIG. 1B. This is converted by translator 55 to an address which identifies the location of the accumulating block portion dedicated to the subscriber. At the same time, counters 58 provide the message number to converter 32. Both the accumulating block storage address and the message number are passed to adder 62, providing to memory accessor 64 a sum defining a specific location in the accumulating block portion of the subscriber. Memory accessor 64 then stores the permanent file storage location of the message in that specific location of the accumulating block portion. It is apparent that the permanent file locations of successive messages from each subscriber are consecutively stored in successive locations of the subscriber's accumulating block portion.

Counters 58 provide to detector 68 an indication when the number of messages from a subscriber is such that his accumulating block is filled. This indication is passed to updating circuit 66 and storage shifting circuit 72. Shifting circuit 72 reads out the contents of the now full accumulating storage block and applies it to a file block, designated by allocating circuit 74. At the same time, updating circuit 66 places in the sum-

mary block of the subscriber the address of the file block into which the contents are being stored, together with the current time and date supplied by clock 70. Thus, the permanent file information is cleared out of the accumulating block and placed in a common file block. At the same time, the address of the common file block, together with the time and date, is placed in the summary block of the subscriber.

In order to retrieve a message, a subscriber station transmits the message number and the approximate date and time that the message was processed by the common control unit. Unit 30, in response thereto, transfers the identity of the station, the message number and the date and time information to retrieval request register 78. Translator 76 converts the station identity into the address of the summary block dedicated to the station and enables memory accessor 77 to read out the successive day and time entries in the summary block. As the entries are read out, they are compared by comparator 80 with the date and time information in register 78 until a time and date is found which postdates the time and date entries provided by register 78. Adder 82 thereupon sums the file block address stored in the summary block with the message number provided by register 78. This defines the specific address or location in the file block which stores the permanent file location of the message. The address information is then passed to memory accessor 85, which reads out the desired permanent file location onto plural conductor bus 89.

The queueing memory is identified as memory 100 and is shown in FIG. 1C of the application. * * *

That portion of the permanent file location on plural conductor bus 89, FIG. 1C, which constitutes the tape reel identification is converted by translator 90 to the address which locates the first storage cell of the couplet dedicated to that particular reel. This address is supplied to retrieval request queueing circuit 93 along with the tape reel record

number which was read out onto plural conductor bus 89 along with the tape reel identification.

All the claims on appeal apparently define the invention which includes the programmable common control unit 30, Fig. 1A, and other elements of the figures. Claim 9 is representative:

9. In combination in a message retrieval organization, a plurality of station sets having messages associated therewith, storage means including message memory and cross reference file portions thereof, a translating network and common control means cascaded between said station sets and said message memory portion of said storage means, permanent file memory means, means for sequentially registering in said permanent file memory all messages stored by said stations in said message memory portion of said storage means, means connected to said common control means and responsive thereto for entering the permanent file memory location containing the message in a storage section of said cross reference file portion of said message memory dedicated to said station, and means responsive to retrieval requests generated by said stations for extracting a corresponding list of permanent file storage locations from said cross reference file portion of said storage means.

### The Rejection

The rejection as expressed by the board is that the claims are "based on a vague, indefinite and insufficient disclosure under 35 U.S.C. § 112." While there may be other interpretations of the statutory bases for the rejection, the one which is clear and which we find dispositive is under the enablement section of the first paragraph of § 112. The position of the Patent Office is that appellants' specification does not contain a written description of the manner of making and using the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same * * *."

The examiner's position was stated in the first official action in the following language, with which the board agreed and essentially incorporated by reference into its own opinion:

(a) In the specification applicants have set forth what purports to be a method [1] and apparatus for retrieving messages processed by a store and forward communications system. The specification, however, merely sets forth elements only by name and the plural functions desired therefrom. Such a disclosure is insufficient to comply with 35 U.S.C. § 112 or Rule 71 (specifically Rule 71(b)).[2] The bare statement, that control unit 30 may be a "stored program controlled structure" disclosed in copending "jumbo" application S.N. 334,875,[3] is insufficient to teach, with any degree of clarity, one of ordinary skill in the art what the contents of rectangle 30 of Figure 1A are. To what elements in said copending application are applicants referring? How and by what means are said elements programmed to perform the plural desired results (at the appropriate time) which are set forth for element 30 of the instant

---

1. Appellants have withdrawn their appeal with respect to the method claims which were additionally "rejected as being drawn to mental processes under 35 U.S.C. §§ 100, 101." Pursuant to motion of appellants granted Jan. 3, 1973, the appeal with respect to claims 12 through 15 was dismissed.

2. (b) The specification must set forth the precise invention for which a patent is solicited, in such manner as to distinguish it from other inventions and from what is old. It must describe completely a specific embodiment of the process, machine, manufacture, composition of matter or improvement invented, and must explain the mode of operation or principle whenever applicable. The best mode contemplated by the inventor of carrying out his invention must be set forth.

3. Now U.S. patent 3,570,008 to Downing et al., filed Dec. 31, 1963, 132 sheets of drawing and 137 pages of specification as printed.

disclosure. [?] The further statement, that other elements of Figures 1A, 1B and 1C are well known or may be found in copending application S.N. 405,429,[4] is also insufficient to set forth the best mode contemplated and further fails to teach what elements are referred to by applicants, and how they may be connected and controlled (specifically) to produce the results desired therefrom.

(b) How and by what means (specifically) are the rectangles shown in Figures 1A, 1B and 1C caused to perform their functions, and do so at the appropriate time? In particular how and by what means (specifically) is rectangle 30 caused to perform the plural desired functions recited throughout the specification?

(c) * * * how and by what means does element 74 function so as to furnish the proper one of a plurality of addresses desired therefrom, and do so at the proper time? How and by what means (specifically) does element 72 perform the desired functions recited * * *. How and by what means is element 66 "adapted" to perform the plural functions recited * * *?

(d) How and by what means (specifically) are the functions recited * * * obtained? How and by what means is element 105 "adapted" to perform in accordance with the recitation * * * [in the specification]? How and by what means are multiple requests for any single tape reel organized by record number as stated * * *? How and by what means (specifically) does element 93 perform the functions recited * * *, how and by what means does element 105 obtain the proper address to interrogate? How and by what means is element 105 caused to perform the functions recited * * *? How and by what means are requests for off line tape reels detected, as recited * * *? What is the nature of element 95 such that it will indicate which off line reel is desired, as stated * * *?

(e) * * * applicants' statements that the contents of the rectangles of Figure 1, and how they cooperate and are controlled are apparent to those skilled in the art in view of the functional recitation in the specification is insufficient to serve the purpose of completing the disclosure.

Appellants responded in an amendment dated May 17, 1968, traversing the rejection under section 112 and, as appellants' brief states,

* * * noted that the specification has been amended [by the addition shown in italics below] to more specifically indicate illustrative apparatus for the control unit 30 and directed the Examiner's attention to that portion of the specification which states:

"The common control unit 30 may advantageously comprise a stored program controlled structure as disclosed, for example, in a pending application by A. H. Doblmaier— R. W. Downing—M. P. Fabisch— J. A. Harr—H. F. May—J. S. Nowak—F. F. Taylor, Serial No. 334,875, filed December 31, 1963 (*also described in the Bell System Technical Journal, September 1964*). *Specifically, the central processor of the system (described in the Bell System Technical Journal id, pages 1845–1922) could be programmed to perform the function of the common control unit 30 as hereinafter described.*"

Appellants' amendment also discussed the other units which the Examiner found objectionable, indicating illustrative embodiments of these units to show that the implementation of the units is apparent to one skilled in the art.

I. R. E. Swift, filed Oct. 21, 1964.

Specifically discussing common control unit 30, appellants' amendment remarked:

It is emphasized however that specific details of the common control unit 30 are of no import to applicants' invention. Applicants are not claiming the details of the stored program structure 30 but rather the use of the unit 30 in combination with the other units. The functions to be performed by the common control unit 30 are simple straightforward translations of inforformation all of which are considered well known in the data processing art. Is not the function of forwarding information from the translation network 20 to the message memory 25 as described on Page 4 of the specification straightforward and obvious? Likewise, is not the registering of this information on the tape reel 40 as described on Page 5 of the specification obvious and straightforward? Although detailed circuitry of which the common control unit 30 could be comprised is not set forth specifically, it is obvious from the above noted functions and the other functions set forth in the specification that the common control unit could be a standard "stored program controlled structure." A more detailed discussion of the nature of the control unit 30 and its method of operation is deemed unnecessary in view of the simple and straightforward functions which it accomplishes and since, as mentioned earlier, the invention resides not in the unit itself but rather in its use in combination.

Appellants' amendment also discussed the other units descriptions of which the examiner had found objectionable.

The examiner, in an official action dated July 17, 1968, made the rejection final and observed, with respect to appellants' remarks about control unit 30:

Applicants' argument, that control unit 30 can be the central processor disclosed in co-pending "jumbo" application S.N. 334,875, that said processor can somehow be programmed to produce the plural desired results recited throughout the instant application, and that as such, the disclosure teaches how and by what means rectangle 30 may be implemented, is non-persuasive. Without additional experimentation, it is not deemed to be within the scope of one of *ordinary* skill in the art (presumedly a combination engineer-programmer) to select appropriate elements, connect, control and program them so as to solve applicants['] particular problem. In any event such a disclosure does not set forth any "best mode" as required. Applicants' further argument, that all the desired functions are straightforward and obvious, is also non-persuasive. If such be the case applicants will have no difficulty in demonstrating that the elements in question existed at the time of filing, and in teaching how such elements may be connected and controlled to produce functions desired therefrom. Mere citation of general purpose data processing systems or subsystems accompanied by allegations that such systems contain the requisite parts, and can be assembled to perform as applicants wish, cannot serve to complete the disclosure.

In an amendment submitted after final rejection, dated October 10, 1968, appellants again traversed the rejection and submitted affidavits of Messrs. John R. Williams, Harvey R. Lehman, and coinventor Harry G. Kienzle. Each affiant averred that, from a reading of the application, it was apparent to him and, in his opinion, it would be apparent to other skilled in the art, how to make and use (or practice) the system and the various units disclosed in the application. In addition Kienzle prepared and appended to his affidavit some rough sketches of exemplary circuit apparatus for block updating circuit 66, storage shifting circuit 72, storage allocating circuit 74, retrieval request queueing circuit 93, and accessor 105.

In their "Remarks" in the amendment, appellants made the following comments

about the affidavits and particularly the computer programs which are necessary to practice the invention and their failure to disclose them specifically:

Both Mr. Lehman and Mr. Kienzle state in their affidavits that it is apparent to them from a reading of the application and in their opinions it would be apparent to system and circuit design engineers of ordinary skill how to make and use the message retrieving system disclosed in the application. Mr. Williams and Mr. Kienzle both state in their affidavits that it is apparent to them from a reading of the application and in their opinions it would be apparent to others skilled in programming information processing systems how to practice the disclosed process on an information processing system such as the No. 1 Electronic Switching System Arranged with Data Features. This latter system consists of certain units of the No. 1 Electronic Switching System (described in Bell System Technical Journal, September, 1964) augmented with certain other equipments such as permanent file storage tape reel memories and a message memory similar to those described in the present application. As Mr. Williams states in his affidavit, programs have been devised at Bell Telephone Laboratories for carrying out the process disclosed and claimed. These programs have been executed on the No. 1 Electronic Switching System Arranged with Data Features. More information regarding these programs is not submitted herewith because the detailed information is considered proprietory [sic] with the Bell Telephone Laboratories [appellants' assignee].

The examiner entered the amendment for purposes of appeal and summarized his views of the rejection and prosecution history in his Answer, which the board incorporated by reference into its opinion. The examiner stated:

* * * no amount of sophistry can avoid or overcome the fact that the instant disclosure fails to teach in such full, clear, concise and exact terms such that one of ordinary skill in the data processing art could make and use the contribution without undue experimentation. The best evidence of the accuracy of such a conclusion is the disclosure itself. A review of the instant disclosure reveals little more than a system diagram consisting of three sheets of labeled rectangles, accompanied by statements of a myriad of desired results. Consistently throughout the prosecution appellants have alleged that all the functions recited are well known data processing functions which could be performed by well known elements or elements whose construction would be obvious to a routineer in the data processing art. Consistently throughout the prosecution, the examiner has invited citation of exemplary such elements, steps and/or subroutines and a teaching of how they may be incorporated into the system such that the elements (or "functional blocks" as they are called * * *) shown broadly in Figures 1A, 1B, and 1C could function and cooperate to obtain the desired results. The response to such invitations has been consistently broad, fragmentary and confusing.

For example, throughout appellants' responses (including the affidavits) it is stated that all the functions performed by common control unit 30 are well known data processing functions, and that the central processor found in a voluminous co-pending application could perform said functions. Implied in such statements is the fact that the cited central processor can not perform as appellants wish, unless properly programmed. The instant disclosure is completely devoid of any such program or even a flow chart to indicate the functions to be performed, the sequence in which they are to be performed, and the conditions which must be present at the time of performance. * * *

Assuming, arguendo, that all the many functions recited throughout the specification are "well known data processing

functions"; to further presume that the structural elements for each is well known, and the elements are of similar construction such that they could be operatively connected and controlled by a routineer without undue experimentation is viewed at best as unduely [sic] optimistic. As previously stated here and in the final rejection, if the elements, functions, steps and/or subroutines are so well known or so basic in the data processing art, appellants will have little difficulty in citing them, and teaching how they may be incorporated into the system to obtain the desired results. As presently recited, the disclosure fails to teach the invention with the specificity required by the first paragraph of 35 U.S.C. § 112.

* * * the affidavits fail in their purpose since they recite conclusions and few facts to buttress said conclusions; In re Pike et al., 1950 C.D. 105. The affidavit of Mr. Lehman, for example, states that all elements of the system are either well known system components or could, with no difficulty, be constructed by a skilled design engineer. Of the many elements in question, however, the affiant cites only elements 30 and 95 as being well known. As to element 30, the affiant concludes that all the functions performed by element 30, recited throughout the specification, are standard and that the central processor in a co-pending application could perform all said functions. Conspicuous by its absence is any recitation of which instructions for the cited central processor will perform the specific functions recited in the specification. Only the broad conclusion that the referenced central processor is capable of such performance is stated. Further it is to be noted that the referenced central processor is *not* capable of obtaining the desired results unless properly programmed. * * *

* * * * * *

The affidavit of Mr. Williams is simularly [sic] deficient in that it merely recites conclusions without stating sufficient facts to support the conclusions. The affiant merely concludes that the disclosed process could be practiced by ordinary programmers on an information processing system referred to on page 2 of his affidavit. He further concludes at the bottom of the same page that each of the steps or subroutines of the process described "are standard data processing functions". Conspicuous by its absence is any reference to any specific instructions or subroutines for performing specific steps of the process appellants wish to perform.

Mr. Williams further states that programs have in fact been developed by the instant assignee for carrying out the process disclosed. It is noted, however, that no circumstances pertaining to this accomplishment are mentioned, such as, the number of programmers involved, the number of man-hours involved, and the level of skill of the programmers involved. The disclosure must be such that one of ordinary skill in the art could implement the process *without requiring undue experimentation;* see Ex parte Greenlee, 123 U.S.P.Q. 388, and In re Chilowsky [306 F.2d 908, 50 CCPA 806], 134 U.S.P.Q. 515. It would appear to the examiner that the development of said programs would require more than mere routine coding, and might itself require inventive ingenuity. Further it would appear that the proper place to disclose such programs would be in the instant specification. Appellants cannot have it both ways in demanding protection of all such programs or equivalents while disclosing none.

The affidavit by appellant Kienzle for the most part also only states conclusions rather than facts to show that the instant disclosure complies with the first paragraph of 35 U.S.C. § 112. The appellant's affidavit goes further than the other affidavits in that it includes as exhibits exemplary contents of seven of the Figure 1 "functional blocks". Mr. Kienzle further alleges that such circuitry or simular [sic] circuitry would occur to routineers in the art after studying the instant disclosure. Bearing in mind that said routineers would have to also design and/or program others of the

"functional blocks" of Figure 1, in addition to designing the relatively complex circuitry shown in the exhibits, the examiner is not persuaded that one of *ordinary* skill in the data processing art could implement the system and process disclosed without undue experimentation. Further affidavits cannot be used to supply facts which the disclosure itself should supply; note In re Smyth [189 F.2d 982, 38 CCPA 1130], 93 U.S.P.Q. 106, (C.C.P.A.1951).

The board, in addition to incorporating by reference the position of the examiner expressed in his Answer, emphasized several points which illustrate the crux of the present controversy. With respect to the need for computer programs for the central processor, the board noted agreement with the examiner that Williams' statement that programs have been developed for carrying out the disclosed processes "lacks any factual data from which one can determine, (1) what they are, (2) when they were developed, and (3) how much time, and what level of skill was needed for the development of these programs."

Later, with reference to the statements of the affiants that "programs could be developed for prior art devices to enable them for operation in the present system" the board stated:

It appears from the case law on programed machines that the CCPA treats such machines as a storeroom of parts and/or electrical components (see footnote 29, In re Prater [415 F. 2d 1393, 56 CCPA 1381], 162 USPQ 541) and when such a storeroom of parts is programed in a certain new and unobvious way it is physically different from the machine without a program. (In re Bernhart et al. [417 F.2d 1395, 57 CCPA 737], 163 USPQ 611). The program then sets the interconnection of the parts in the warehouse, as well as the principle of operation of the machine. Under these circumstances, the program is a part of the machine and a complete disclosure requires (1) hardware and circuitry,

(2) programs, none of which are present in the instant disclosure.

The board also said:

In the absence of disclosed hardware and circuitry as required by the Examiner, neither he nor we can determine whether it takes more than the skill of the art to implement the present disclosure.

## OPINION

The above summary of the prosecution history of the application suggests that one of the reasons why the board sustained the examiner's rejection under the enablement provision of § 112 was that the evidence, including the affidavits, the Bell System Technical Journal publication, and the specification, was not sufficient to prove to the satisfaction of the examiner or the board that one of ordinary skill in the art could practice the invention wihout undue experimentation. The board expressed agreement with the examiner's appraisal of the affidavit evidence as being generally conclusory statements, rather than showing facts which would enable the examiner or the board to determine whether the specification would truly enable one of ordinary skill to practice the invention.

The affidavits submitted by appellants generally express the affiants' opinions on the ultimate legal question whether the specification is enabling, and, as appellants admit in their brief, "opinions directed to *ultimate legal* questions are not competent expressions of opinion." Appellants attempt to show that the affiants' "opinion statements * * * do not render opinions of this ultimate legal question" with the following sophistry:

The various opinion statements by the affiants aver that, in the opinion of the affiant, one skilled in the art from a reading of the specification could construct a system or practice the disclosed process or, alternatively, it would be apparent to one skilled in the art from a reading of the specification how to construct the system or practice the process. These are not opin-

ions directed to the *ultimate legal question* [whether or not the application contains an enabling disclosure]. These are not opinions as to the *sufficiency* of the specification; opinions that the *specification* is written in such "full, clear and exact terms" to enable one skilled in the art to practice the *invention*. These opinions are, therefore, facts which tend to prove that the Statutory requirements have been met by the specification. We submit that these opinions are facts which must be considered and be given appropriate weight.

■ Affiants' statements that they would themselves be able to practice the invention are certainly some evidence on the ultimate legal question of enablement, but we must agree with the examiner's statement that "the affidavits fail in their purpose since they recite conclusions and few facts to buttress said conclusions * * *."

■ We have studied the entire specification, the referenced patents and publications, and all the information supplied by appellants and agree with the examiner and the board that the information which has been submitted by appellants is not sufficient to establish that their specification is enabling, within the meaning of § 112. The affidavits, considered with the questions asked and reasons given by the examiner, and the level of skill in this art shown by the record, do not convince us that the examiner's challenge to enablement was unreasonable or has been met. Appellants have not submitted to the examiner even flow charts of the programs which they admit their assignee has developed for the practice of their invention, and the examiner correctly observed that he has been given "no circumstances pertaining to this accomplishment * * * such as, the number of programmers involved, the number of man-hours involved and the level of skill of the programmers involved."

■ In In re Ghiron, 442 F.2d 985, 58 CCPA 1207 (1971), we affirmed a simi-

lar rejection under the enablement portion of the first paragraph of § 112. In that case we noted that the board "was questioning not only appellant's assertion that the selection and assembly of the components required to practice the claimed process were within the skill of persons in the art *but also the fact that such selection and assembly could be carried out routinely*." (Our emphasis.) In a footnote we said:

We are in complete agreement with the following statement of the board on this latter point:

"It is well settled that a routineer in an art has an expertise above that of the unskilled person, but if the selection of suitable apparatus requires *unreasonable experimentation and delays* for him to come into possession of the apparatus that could carry out the invention, a disclosure thus deficient would not be adequate legal consideration for the grant of a patent." [Emphasis added.]

We adhere to the above statement and find it applicable to the facts here.

■■ Apropos, and also illustrative of what we meant by the requirement that the specification enable one routinely to carry out the invention, is the further language we quoted with approval from the board's opinion in *Ghiron*:

Many of the components which appellants illustrate as rectangles in their drawing necessarily are themselves complex assemblages that can have widely differing characteristics that must be precisely coordinated with other complex assemblages. It is common knowledge that many months or years elapse from the announcement of a new computer by a manufacturer before the first prototype is available. This does not bespeak of a routine operation but of extensive experimentation and development work that would be inconsistent with appellant's bare allegation that the instant disclosure would put a person of ordinary skill in the art in possession of the apparatus to carry

out the claimed method. The lines interconnecting the rectangles of appellants' drawings do not represent electrical conductors but merely indicate the routing of intangible data or information between functional modules.

The references to "unreasonable experimentation and delays" and to "extensive experimentation and development work" in *Ghiron* show our consideration of the amount of time and effort which may be involved in practicing the invention as an aspect of the requirement that one skilled in the art be enabled to practice the invention. Such factors must be considered, and, in such arts as computer programming, where one or more skilled programmers may be *able* to produce the program required to practice the invention only after working for "many months and years," we do not believe it is unreasonable for an examiner to require an applicant who has prepared such a program to at least give an appraisal of the amount of time involved in its production or to disclose at least a bare bones flow chart of that program to the Patent Office so that the examiner may determine whether one skilled in the art could produce it without unreasonable experimentation and delays.

We held in *Ghiron* that the board had a reasonable basis for questioning the adequacy of the disclosure, and we so hold here. Without some indication of the amount of time and effort which one of ordinary skill might have to expend to develop the program necessary to practice the invention, or a disclosure of the program from which the examiner and the board, perhaps through the shorthand expression of a flow diagram, could determine these, we think the board reasonably determined that the examiner was correct in holding that appellants have not proved that one skilled in the art would have been able to practice their invention without undue experimentation and delays.

The decision of the board is affirmed.

Affirmed.